IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLNIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| J.R., A MINOR AND JANE ROE INDIVIDUALLY AND IN HER CAPACITY AS GUARDIAN AND PARENT OF PLAINTIFF J.R. | ) ) ) ) | CIVIL ACTION NO.: 2:23-cv-2519-BHH |
| Plaintiffs, | ) ) ) ) | |
| MICHELE MANCINO, THOMAS E. ASPINWALL, TELEGRAM MESSENGER INC. (D/B/A "TELEGRAM"), AND PERRY STREET SOFTWARE (D/B/A "SCRUFF") | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT**

Plaintiffs J.R. and Jane Roe, complaining of Defendants, respectfully shows unto the Court and alleges as follows:

**SUMMARY OF THE ACTION**

1.      This complaint involves the perverse and harmful actions of multiple Defendants engaged in the trafficking of a four-year-old (4) child.

2.      On August 13, 2022, Defendant Aspinwall wrote to Defendant Mancino, "He would love your [genitals]." To which Mancino replied, "Yeah. And he doesn't even wait for me anymore when he gets horny he knows what to do…[h]e comes and starts running my bulge to get me hard then I'll take it out and he likes to stroke it then lick it and sucks it."

3.      The "he" the Defendants were referring to was Mancino's then-four-year-old son, the minor Plaintiff J.R.

1

4.     This heinous conversation was carried out entirely on Defendant Telegram Messenger Inc.'s platform, Telegram.

5.     Upon information and belief, Defendants Mancino and Aspinwall met online through Defendant Perry Street Software's application, Scruff.

6.     Upon information and belief, Scruff is an internet application (providing a social forum for homosexual men.

7.     In addition to Telegram, Mancino and Aspinwall also relied on Scruff to traffic and sexually assault Plaintiff.

8.     Over Scruff, Defendants Mancino and Aspinwall conversed about Plaintiff J.R. "[loving Defendant Mancino's genitals]."

9.     Over Scruff, Defendant Mancino stated that he supported and fostered this perverse conduct, stating he "wanted Plaintiff J.R. to like [adult male genitals]."

10.     Further, Defendant Mancino stated that he wanted "to share [Plaintiff J.R.,]" to which Defendant Aspinwall replied that he wanted to have sex with both Defendant Mancino and the Minor Plaintiff on the Minor Plaintiff's bed.

11.     Sexual Misconduct is a comprehensive term that includes child sexual abuse, grooming, sexual abuse, sexual harassment, rape, sexual conduct, and sexual malfeasance.

12.     Based on the forgoing, Plaintiff J.R. was the victim of child sex trafficking, grooming, rape, sexual assault, and sexual exploitation perpetrated by Defendants Michele Mancino and Thomas Aspinwall and facilitated by the platforms of Perry Street Software (d/b/a "Scruff") and Telegram Messenger Inc. (d/b/a "Telegram").

13.     As a result of this monstruous conduct, Plaintiff J.R. has suffered immeasurable losses and will likely have to undergo intense psychiatric therapy for the remainder of his life.

14.     Defendants Telegram and Scruff acted in dereliction of their duties as internet service providers by failing to adequately monitor and police against such harm on their platform.

15.     Defendant Aspinwall was indicted for using internet platforms to arrange a sexual encounter with a minor in 2015.[1]

16.     This conduct should have alerted Defendants Scruff and Telegram to the danger of opening up their platform to him.

17.     Neither Scruff nor Telegram ever elicited this information from Defendant Aspinwall, and he was given unfettered access to engage in any type of harmful behavior he desired on their platforms.

18.     This failure by Scruff and Telegram to monitor and police their platforms enabled and facilitated the harm that Plaintiffs have suffered and continue to suffer.

## PARTIES

**Plaintiffs**

19.     Plaintiff John Doe ("J.R.") is a minor who is a citizen and resident of Charleston County, South Carolina.

20.     Plaintiff Jane Roe is the mother of Plaintiff J.R. and is also a citizen and resident of Charleston County, South Carolina.

21.     Plaintiff Jane Roe is bringing this lawsuit individually and on behalf of her son, Plaintiff J.R., in her capacity as next friend and parent of Plaintiff J.R.

22.     Plaintiffs are filing this action anonymously under the pseudonyms John Roe (a minor designed as "J.R.") and Jane Doe because the subject matter of this lawsuit could bring embarrassment and publicity to the Plaintiffs and/or their family.

---

[1] https://www.postandcourier.com/news/snapchat-tip-leads-police-to-charge-charleston-man-with-child-sex-crimes/article_80e9d2ea-5ebc-11ed-957d-e3b963eb10aa.html

23.     Plaintiffs are both uniquely vulnerable to the mental or physical harms of disclosure.

24.     Plaintiffs risk humiliation and embarrassment due to the necessary publication of intimate materials and allowing them to proceed with pseudonyms brings comfort.

25.     If the ability to proceed with pseudonyms is not allowed, Plaintiffs will experience further harm as a result of exercising their legal rights.

26.     If Plaintiffs are forced to disclose their identities, that disclosure will amplify the injuries that are at issue in this litigation.

27.     The public interest in the disclosure of Plaintiffs' identities is minuscule.

28.     There will be no furtherance of justice by requiring the public disclosure of Plaintiffs' identities.

29.     Once the Defendants are served and retain counsel, Plaintiffs' identities will be revealed to Defendants in a confidential manner, if not already known.

30.     Defendants are not prejudiced by allowing Plaintiffs to proceed anonymously, and any potential prejudice will be mitigated by the confidential disclosure of his and her actual identities.

**<u>Defendants</u>**

31.     Defendant Michele Mancino, father of Plaintiff J.R., is a resident and citizen of Charleston County, South Carolina.

32.     Defendant Thomas E. Aspinwall is a resident and citizen of Charleston, County, South Carolina. Defendants Mancino and Aspinwall will be sometimes collectively referred to as the "Individual Defendants."

33.     Upon information and belief, Defendant Aspinwall has been, prior to the conduct at issue in this litigation, indicted for sexual crimes involving a minor male, facilitated through internet dating platforms.

34.     Defendant Perry Street Software is a company with its principal place of business in New York, New York, USA.

35.     Upon information and belief, Defendant Perry Street operates a platform known as "Scruff," a dating service designed for connecting homosexual men.

36.     By virtue of voluntary actions taken to "combat" trafficking on their site, Scruff has acknowledged that it knows trafficking exists and it knows that it has to use the latest and most technologically advanced software to truly combat this heinous activity rife on its application

37.     Defendant Telegram Messenger Inc. is a company with its principal place of business in Tortola, British Virgin Islands.

38.     Upon information and belief, Defendant Telegram Messenger Inc. owns and operates "Telegram," an internet messaging platform known for its privacy.

39.     By virtue of voluntary actions taken to "combat" trafficking on their site, Telegram has acknowledged that it knows trafficking exists and it knows that it has to use the latest and most technologically advanced software to truly combat this heinous activity rife on its application

40.     Defendants Perry Street Software and Telegram Messenger, Inc. will sometimes be collectively referred to as the "Internet Defendants."

41.     Internet Defendants have the right or power to direct and control the way its employees and/or agents provide care and operate the business of delivering internet services, applications, and a safe product to consumers.

42.    Internet Defendants have the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

43.    Upon information and belief, Internet Defendants have proper policies, procedures, and guidance on the ways they prevent child sex trafficking or child exploitation and have knowledge of how to prevent known sexual predators from using their service.

44.    Internet Defendants have a non-delegable duty to provide employees and/or agents with adequate knowledge and training to prevent child sex trafficking and child exploitation through its internet services and applications.

45.    Before the events underlying this case, which took place in the Summer of 2022, employees and/or agents of Internet Defendants had actual knowledge that sexual predators were using their applications.

46.    Before the events underlying this case took place in Summer 2022, employees and/or agents of Internet Defendants had actual knowledge that a vulnerable population of children were subject to sexual abuse and exploitation if reasonable precautions were not exercised in hiring, supervision, training, and employment of qualified employees and/or agents.

47.    Despite this knowledge, and despite knowing that their employees and/or agents had the opportunity to prevent the sexual abuse and exploitation of vulnerable children, upon information and belief, Internet Defendants employed and continue to employ unqualified employees.

48.    At all times relevant hereto, the employees and/or employees of Internet Defendants (with respect to the facts alleged herein) acted within the course and scope of their employment and/or agency with Internet Defendants.

49.     Internet Defendants voluntarily undertook the duty of providing "supposed" safety features to prevent child sex trafficking and exploitation prior to the events in this case.

50.     Internet Defendants knew that Minor Children exposed to sex trafficking and exploitation were at risk of unfathomable harm, and also knew that if children were sex trafficked or exploited it would cause lifelong emotional and behavioral difficulties.

51.     The negligent, grossly negligent, reckless, willful, or wanton acts, omissions, and liability of Defendants includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or *respondeat superior*.

## JURISDICTION AND VENUE

52.     All of the conduct giving rise to the allegations in this complaint occurred in South Carolina.

53.     Plaintiffs and two of the Defendants are citizens and residents of South Carolina.

54.     Defendant Perry Street Software, operator of Scruff, is a company with its principal place of business in New York, New York.

55.     Defendant Telegram Messenger Inc., operator of Telegram, is a company with its principal place of business in Tortola, British Virgin Islands.

56.     Jurisdiction is proper in federal district court because of federal question jurisdiction.

57.     Since Charleston County is the domicile of four of the six parties in this action, it is the most convenient for all parties.

58.     Based on the forgoing, Charleston County is the proper venue for this action.

## JOINT AND SEVERAL LIABILITY

59.    The above-named Defendants are jointly and severally liable for all damages alleged herein since their negligent, grossly negligent, reckless, and wanton acts and omissions, singularly, or in combination, are the contributing proximate causes of Plaintiffs' injuries, damages, and losses.

## SEX TRAFFICKING OF CHILDREN HAS EXPLODED IN THE LAST DECADE

60.    According to the United States Department of Homeland Security in 2016, the horrific crime of human trafficking and the sexual exploitation of trafficking victims generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking.

61.    According to the International Labour Organization ("ILO") and Walk Free Foundation, in a report published in 2017, it was estimated nearly four (4) million adults were victims of forced sexual exploitation and one (1) million children were victims of commercial sexual exploitation in the year 2016.

62.    In 2014, the National Center for Missing and Exploited Children reported an 846% increase from 2010 to 2015 in reports of suspected child sex trafficking-an increase the organization has found to be "directly correlated to the increased use of the internet to sell children for sex."

63.    Sex trafficking does not just involve the payment of money for sex with a child.

64.    Trafficking is the use of a child to induce some form of benefit to a party in exchange for some incremental benefit to the trafficker.

65.    This can include the use of Internet sites which facilitate and tacitly encourage this type of conduct.

66.    Most internet sites behave responsibly where trafficking is concerned.

67.    Yet, there are other sites, such as Scruff and Telegram, who openly state they attempt to prevent trafficking conduct, yet they facilitate trafficking conduct through poor oversight and outright denial that exists on their sites.

68.    The State of South Carolina, and specifically Charleston County, has not escaped this horrific trend.

69.    Charleston County ranks second behind Horry County for reported human trafficking cases in the state.

70.    Statistics released in 2014 by the ILO showed that approximately four-and-a-half (4.5) million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of ninety-nine (99) billion dollars for sex traffickers worldwide.[2]

71.    Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.

72.    In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[3]

---

[2] International Labour Office, Profits and Poverty: The Economics of Forced Labour (2014), at 13, available at https://www.ilo.org/wcmsp5/groups/public/---ed_norm/--declaration/documents/publication/wcms_243391.pdf. 11 Id.
[3] U.S. Dep't of State, 2016 Trafficking in Persons Report (2016), at 41, available at https://www.state.gov/documents/organization/258876.pdf

73. The United States Department of Justice ("DOJ") brought two-hundred and forty-eight (248) sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.

74. In the previous year, DOJ convicted a total of one-hundred and eighty-four (184) human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total four-hundred and thirty-nine (439) human traffickers (inclusive of labor trafficking)

75. Between 2007 and March 2015, more than one-thousand four hundred (1,400) human trafficking cases were reported to the National Human Trafficking Resource Center.[4]

## CHILD SEX TRAFFICKING AND EXPLOITATION

76. Child sex trafficking is a scourge on any community and causes unknown yet irrevocable harm to the victims of this reprehensible crime.

77. Child sex trafficking is the recruitment, harboring, transportation, provision, obtaining, or soliciting of a minor for the purpose of a sexual act.

78. The persons who traffic children can be relatives, family friends or an unknown person.

79. Victims frequently fall prey to their traffickers who use food, attention, friendship, and love to cultivate the trust needed to manipulate the child into harmful and destructive acts.

80. Child sex trafficking is not a one-time event; it is an ongoing process that involves the trafficking, exploitation, and abuse of children over an extended period of time.

81. Child sex trafficking typically involves a cycle of violence, coercion, and manipulation that can have long-lasting physical and psychological effects on victims.

---

[4] Polaris, Human Trafficking and the Internet Industry (2015), available at https://polarisproject.org/resources/human-trafficking-and-the-internet-industry

82. Traffickers often use a variety of tactics to control their victims, including physical violence, threats, and emotional manipulation.

83. They may also use drugs or alcohol to impair the child's judgment and make them more vulnerable to exploitation.

84. Victims of child sex trafficking may be forced to engage in sexual acts with multiple offenders per day, often for extended periods of time.

85. They may be moved from one location to another, making it difficult for them to escape or seek help.

86. The trauma and abuse experienced by victims of child sex trafficking can have lifelong consequences, including PTSD, depression, anxiety, and other mental health issues.

87. It is important to recognize that child sex trafficking is not a one-time event and requires ongoing support and resources for victims to recover and heal.

88. In the case at hand, the child victim was recruited and used by his father as a sexual pawn for favors and gratification.

89. This was facilitated with others, including the internet Defendants who facilitated and allowed the use of their platforms for sexual exploitation of the minor Plaintiff in this case.

90. Child sex trafficking victims are heavily conditioned to remain loyal to the trafficker.

91. No child is immune to becoming a victim of child sex trafficking, regardless of the child's race, age, socioeconomic status, or location, and every child involved in this form of sexual exploitation is a victim.

92. Child exploitation refers to the use of children for profit, labor, or gratification by adults or other children.

93.    It is a form of abuse that involves taking advantage of a child's vulnerability, often for personal gain or profit.

94.    Child exploitation can take many forms, including sexual exploitation, forced labor, trafficking, forced begging, forced marriage, child soldiers, and the use of children in criminal activities.

95.    Child exploitation can have long-lasting negative effects on children, including physical and psychological trauma, stunted development, and limited opportunities for education and future success.

96.    It is a violation of children's rights and a form of violence that must be addressed through prevention, protection, and prosecution measures.

97.    It is essential to raise awareness of child exploitation and work to create a safe and secure environment for all children.

## THE USE OF THE INTERNET TO TRAFFICK AND EXPLOIT CHILDREN

98.    In the past decade, Americans' engagement with social media grew exponentially and that explosion in usage is no accident.

99.    Borrowing heavily from the behavioral and neurobiological techniques used by slot machines and exploited by the cigarette industry, Defendants deliberately embedded in their products an array of design features aimed at maximizing engagement to drive consumer participation and increase advertising revenue.

100.    Defendants know traffickers, exploiters and other deviants used their platforms and promoted sex trafficking and exploitation of children.

101.    Children are particularly vulnerable to their use in schemes designed to exploit them by the traffickers, exploiters, and the internet companies – in this case, Scruff and Telegram.

102.    The defects in Defendants' products vary by platform, but allowed and facilitated the exploitation of children.

103.    The resulting ubiquity of Defendants' products in the lives of traffickers and exploiters who know that these internet companies are facilitating their twisted and monstrous abuse of children, and the ensuing harm to them, is hard to overstate.

104.    Defendants' choices have generated extraordinary corporate profits—and yielded immense tragedy.

105.    Children can be exploited over social media in a variety of ways.

106.    Some of the most common forms of exploitation include:

   a.   Sexual Exploitation: Children can be coerced, manipulated, or forced into performing sexual acts, including prostitution, pornography, or sextortion. These acts may be initiated online through social media platforms or may be arranged through social media connections.

   b.   Forced Labor: Children may be forced to work long hours, in hazardous conditions, and for little or no pay. This can occur in various industries, including agriculture, manufacturing, and domestic work.

   c.   Forced Marriage: Children, particularly girls, may be forced into marriage at a young age, often to much older men. Social media can be used to connect the bride and groom, plan the wedding, and facilitate the exchange of money or other resources.

107.    To prevent child exploitation on social media and through internet platforms, it is essential to educate children and their families about the risks involved and provide them with the tools to protect themselves.

108.    This includes promoting digital literacy and responsible social media use, as well as implementing stricter policies and regulations to hold offenders accountable.

109.    It is also crucial to provide support and resources to victims of exploitation and to work with law enforcement and other agencies to identify and rescue children who may be at risk.

110.     Technological advances, in particular on the internet and mobile devices, have facilitated the sex trafficking and exploitation of children by providing a convenient worldwide marketing channel.[5]

111.     Individuals can now use websites and social media to advertise, schedule, and purchase sexual encounters with minors.[6]

112.     Child trafficking through social media can take many forms, but some of the most common methods include:

a.     False Job Offers: Traffickers may post fake job openings on social media platforms and lure the disclosure of personal information or invite them for an interview, which can lead to their abduction.

b.     Sextortion: Traffickers may coerce children into sharing sexually explicit photos or videos of themselves, using the material as leverage to force them into prostitution or other forms of exploitation.

c.     Online Grooming: Traffickers may pose as teenagers or other trustworthy individuals online and develop a relationship with children over time, building trust and emotional connections. Once they have gained the child's trust, they may then use that relationship to lure them into trafficking.

d.     Social Media Ads: Traffickers may use social media ads to recruit children for various purposes, such as child labor, sexual exploitation, or forced begging.

113.     To prevent child trafficking through social media and through internet platforms, it is essential to stay vigilant and educate both children and adults about the risks involved.

114.     More importantly, the most available way of prevention is to hold internet companies accountable for conduct that facilitates child tracking and exploitation.

---

[5] https://www.justice.gov/criminal-ceos/child-sex-trafficking#:~:text=Child%20sex%20trafficking%20refers%20to,of%20a%20commercial%20sex%20act
[6] *Id.*

115.    These companies often advertise their use of internal processes to prevent exploitation and trafficking, yet it may be a ruse in some cases to attempt to appear proactive, when in reality, these same companies are the source of the problem.

116.    Viewership and members drive revenue for internet companies.

117.    When companies are solely focused on raising the number of members, more and more child exploitation and trafficking can occur.

118.    When these companies are profiting from heinous crimes involving children, it is a violation of the most basic of human morality as well as creating liability for them.

119.    Parents and caregivers can try to monitor their children's online activity and teach them how to identify and avoid potentially dangerous situations, yet if the parent is complicit, there is *no one* to protect the child except the internet companies and the law.

120.    Eradication of traffickers and sites which facilitate trafficking and abuse is the best form of protection for minor children.

121.     Social media platforms and internet companies can play a more critical role in preventing child trafficking by enforcing stricter policies and algorithms to detect and remove harmful content.

## PROTECTION OF INTERNET COMPANIES THROUGH SECTION 230

122.    Section 230 of the Communications Decency Act is a federal law that protects social media companies from legal liability for user-generated content on their platforms.

123.    However, there are circumstances under which individuals may be able to sue social media companies and prevent the use of  Section 230 as immunity.

124.    Section 230 refers to such section in the Communications Decency Act.

125.    This law was passed by the US Congress in 1996, and it has been instrumental in shaping the development of the internet as we know it today.

126.    Section 230 states that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

127.    This means that online platforms such as social media websites, search engines, and internet forums are not legally responsible for the content generated or posted by their users.

128.    Section 230 has been credited with allowing the internet to flourish and enabling innovation in the online space.

129.    Without Section 230, online platforms would face significant legal liability for any harmful or illegal content posted by their users, which would make it nearly impossible for them to operate.

130.    However, Section 230 has also enabled online platforms to avoid responsibility for harmful or illegal content, such as hate speech, cyberbullying, and sex trafficking.

131.    The ongoing debate around Section 230 highlights the complex issues surrounding free speech, online safety, and the responsibilities of online platforms in the digital age.

132.    Section 230 is no shield for the Internet Defendants' conduct in this case.

133.    Regardless, Plaintiffs anticipate that the Internet Defendants will raise Section 230 as a shield for their conduct.

134.    Section 230's immunity from liability is limited.

135.    Specifically, it applies only to "a provider or user of an interactive computer service whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker of

information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d. 1096, 1100-01 (9th Cir. 2009) (cleaned up).

136.    Publication generally involves traditional editorial functions, such as reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021).

137.    Publication does not, however, include duties related to designing and marketing a social media platform. *Id.* at 1092-93.

138.    The allegations against the Internet Defendants in this complaint pertain *only* to policing and monitoring their own platforms, not to publishing any kind of content.

139.    Plaintiffs expressly disavow any claims or allegations that attempt to hold Defendants liable as the publisher or speaker of any information provided by third parties.

140.    Section 230 does not shield Defendants' conduct because, among other considerations:

    a.    Defendants are liable for their own actions or inactions, such as a failure to keep known predators off their platforms, and

    b.    Defendants are liable for their own conduct in creating a platform which is not reasonably safe from known harm, such as child sexual exploitation.

141.    In sum, Plaintiffs seek to hold each of the Defendants liable for *their own acts and omissions*: the two users of the platforms for the horrendous content they produced and the two companies for their failure to monitor and police their platforms for this conduct. *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S.Ct. 13 (2020) (statement of Justice Thomas respecting denial of certiorari discussing the distinction between distributor and publisher liability); *cf.* Restatement of Torts § 581 (Am. Law. Inst. 1977) ("one who only delivers or transmits

defamatory material published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character.").

142.    Ultimately, Plaintiffs' claims are not predicated on information provided by another content provider.

143.    Rather, Plaintiffs' claims rest on both the individual Defendants' acts/omissions and the internet Defendants' acts/omissions, independently.

## FOSTA

144.    In the spring of 2018, Congress passed the Fight Online Trafficking Act of 2017 ("FOSTA"), which combined a House bill of the same name with provisions from a Senate bill, the Stop Enabling Sex Traffickers Act (SESTA).

145.    FOSTA, as passed, makes changes to three federal statutory schemes: the Communications Decency Act (Section 230), the Trafficking Victims Protection Act (TVPA), and the Mann Act. *See* PL 115-164, April 11, 2018, 132 Stat 1253.

146.    FOSTA's provisions related to the sexual exploitation of minors are particularly important for protecting children.

147.    The law makes it easier for law enforcement agencies to prosecute individuals and websites that engage in child sexual exploitation by allowing them to use wiretaps and other investigative tools to gather evidence.

148.    In addition, FOSTA requires online platforms to report any suspected instances of child sexual exploitation to the National Center for Missing and Exploited Children (NCMEC) and provides funding for the NCMEC to improve its ability to respond to reports of child sexual exploitation.

149.    Neither Internet Defendant did so in this case.

150.    Overall, FOSTA aims to protect children from exploitation and abuse on the internet by targeting online sex trafficking and the sexual exploitation of minors.

151.    The law provides for increased penalties for those convicted of sex trafficking and the sexual exploitation of minors and provides law enforcement agencies and organizations like the NCMEC with additional tools and resources to prevent and combat these crimes.

152.    FOSTA amends Section 230 of the Communications Decency Act (CDA) to make online platforms and internet service providers ("ISPs") more accountable for sex trafficking and exploitation that occurs on their platforms.

153.    FOSTA provides for criminal and civil liability for websites that "knowingly assist, facilitate, or support sex trafficking" by allowing sex trafficking ads or other content related to sex trafficking to be posted on their platform.

154.    It also provides for increased penalties for those convicted of sex trafficking crimes.

155.    Overall, FOSTA is a federal law that aims to combat online sex trafficking and the exploitation of minors on the internet by holding online platforms and ISPs more accountable for the content posted on their platforms.

**SESTA**

156.    Stop Enabling Sex Traffickers Act ("SESTA") is a federal law that was passed by Congress in 2018.

157.    Like FOSTA, SESTA is designed to combat online sex trafficking and the exploitation of minors on the internet. SESTA amends Section 230 of the Communications Decency Act ("CDA") to make online platforms and ISPs more accountable for sex trafficking and exploitation that occurs on their platforms.

158.    SESTA provides for criminal and civil liability for websites that "facilitate, support, or promote prostitution," including by allowing prostitution ads or other content related to prostitution to be posted on their platform.

159.    It also provides for increased penalties for those convicted of sex trafficking crimes.

160.    Overall, SESTA is a federal law that aims to combat online sex trafficking and the exploitation of minors on the internet by holding online platforms and ISPs more accountable for the content posted on their platforms.

161.    Holding websites liable for sex trafficking under FOSTA or SESTA would require demonstrating that Scruff and/or Telegram "knowingly assisted, facilitated, or supported sex trafficking" or "facilitated, supported, or promoted prostitution."

162.    By allowing an indicted sexual predator, Defendant Aspinwall, onto their platform, both Internet Defendants knowingly facilitated, supported, or assisted sex trafficking.

163.    By not utilizing algorithms available to the Internet Defendants, they failed to comply with admonitions of FOSTA and SESTA and helped facilitate sex trafficking of the minor child in this case.

164.    By failing to properly monitor content (which they do through algorithm, artificial intelligence, or some other advanced technological process), they facilitated the sexual trafficking and exploitation of the minor child, J.R.

## COMMON WAYS TO PROTECT CHILDREN BY INTERNET PROVIDERS

165.    Many internet companies have implemented measures to prevent child trafficking on its platform, including:

       a. Removing accounts, pages, groups, and posts that violate Facebook's policies on child exploitation, including those that promote or facilitate child trafficking.

b. Using advanced technology, including artificial intelligence and machine learning, to identify and remove potentially harmful content related to child exploitation and trafficking.

c. Collaborating with law enforcement agencies and non-governmental organizations to report and respond to incidents of child trafficking and exploitation.

d. Educating users on how to identify and report suspected cases of child trafficking and exploitation through its Safety Center and other resources.

e. Providing support to victims of child trafficking and exploitation through partnerships with organizations such as the National Center for Missing & Exploited Children and the International Centre for Missing & Exploited Children.

166.    Internet companies, such as Facebook, work with other technology companies and industry groups to share best practices and develop new solutions to combat child trafficking and exploitation online.

167.    Pedophiles may use various tactics to bypass safeguards and traffic children through the internet or social media, including:

a. Creating fake profiles: Pedophiles may create fake profiles on Facebook to disguise their true identities and avoid detection. They may use fake names, photos, and information to deceive children and gain their trust.

b. Manipulating children: Pedophiles may use grooming techniques to establish trust and emotional connections with children, often over a period of weeks or months. They may use flattery, gifts, or emotional manipulation to coerce children into providing personal information or engaging in sexual activity.

c. Exploiting security flaws: Pedophiles may exploit security flaws in Facebook's system, such as using fake IP addresses or VPNs to hide their location and avoid detection.

d. Using encrypted messaging apps: Pedophiles may use encrypted messaging apps, such as WhatsApp or Telegram, to communicate with children and avoid detection by Facebook's monitoring system.

168.    Nevertheless, ISPs and social media platforms cannot simply sit on their hands while they know that predators are utilizing their platforms to commit crimes.

## THE INTERNET DEFENDANTS FACILITATED SEX TRAFFICKING

169.    The Internet Defendants profited from sex trafficking and knowingly or negligently aided and engaged with them in their sex trafficking venture.

170.    The Internet Defendants allowed  traffickers (including g defendants) to use their sites when they knew, or should have known, these actors were using the apps to exploit and traffic children.

171.    The Internet Defendants knew, or should have known, that trafficking was occurring on their platforms, and they were knowingly benefiting financially from doing nothing while children, such as Plaintiff J.R., were being sexually exploited.

172.    The Internet Defendants knew, or should have known, that trafficking was occurring on their platforms because of the constant noticeable and abnormal foot traffic required to appease  traffickers' demands.

173.    The Internet Defendants profited from human trafficking and knowingly or negligently aiding and participating with the traffickers.

174.    The Internet Defendants had the opportunity to stop traffickers in the use of their applications.

175.    Instead, each Internet Defendant failed to take reasonable measures to stop sex trafficking from occurring on their defective product.

176.    At all times material hereto, each of the Internet Defendants enjoyed a steady stream of income that human traffickers bring to their internet brands.

177.    At all times material hereto, the Internet Defendants financially benefitted from their ongoing reputation for privacy, discretion, and the facilitation of child sex trafficking and exploitation.

178.    The Internet Defendants failed to take any steps to alert the authorities, properly intervene in the situation, prohibit indicted sex offenders form using their platforms, or take reasonable security steps to improve awareness of human trafficking and/or prevent sexual exploitation on their sites.

179.    Upon information and belief, the Internet Defendants maintained their deficiencies to maximize profits by:

      a.    Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

      b.    Not refusing access, or reporting users to law enforcement, in order to maximize the number of users; and,

      c.    Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

180.    As a direct and proximate result of these egregious practices on the part of the Defendants, Plaintiffs and other victims of human trafficking have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## **FACTUAL ALLEGATIONS**

181.    According to an affidavit filed by Special Agent Edwin Roman of the U.S. Department of Homeland Security, Defendants Mancino and Aspinwall met on Defendant Perry Street Software's Scruff application in/around June of 2022.

182.    At that time, Defendant Mancino was married to Plaintiff Jane Roe and lived in the home of Plaintiff J.R., sharing childcare responsibilities and supervision.

183.    Also at that time, Defendant Aspinwall was living in Charleston, having been previously arrested by Charleston County sheriff's deputies for second-degree sexual exploitation of a minor in 2015.

184.    The allegations central to Defendant Aspinwall's 2015 arrest were that he used an internet platform to lure a fourteen-year-old (14) boy into having sexual relations with him.

185.    Defendant Aspinwall was thirty-one (31) at that time.

186.    Upon information and belief, Defendant Aspinwall is between ages thirty-eight (38) and thirty-nine (39) now.

187.    On Scruff, in addition to expressing sexual interest with each other, Defendants Aspinwall and Mancino discussed a shared sexual interest in children, specifically discussing sexually exploiting Plaintiff J.R., Defendant Mancino's then-four-year-old son.

188.    As part of this conversation on Scruff, Defendant Mancino sent multiple photos and videos of his son engaged in sexual acts.

189.    One six-second video sent by Defendant Mancino to Defendant Aspinwall over Scruff depicted Plaintiff J.R. wearing only a tank-top shirt and facing away from Defendant Mancino.

190.    Defendant Mancino was naked, had an erect penis, and was actively sexually abusing his son, Plaintiff J.R., by placing his genitals in his son's anal region.

191.    Another six-second video depicts Plaintiff J.R. laying prone on his stomach wearing only a shirt.

192.    In this video, Defendant Mancino is naked and straddling his son with his erect penis contacting his son's anal region.

193.    A third six-second video depicts an adult male penis being thrust in and out of a minor's mouth.

194.    A fourth six-second video depicts a minor performing oral sex on an adult male penis.

195.    These videos were sent to, and solicited by, Defendant Aspinwall for both his and Defendant Mancino's sexual gratification.

196.    Defendant Perry Street Software knew or should have known of Defendant Aspinwall's history of using internet platforms to sexually assault minors.

197.    Permitting Defendant Aspinwall to use Scruff directly brought about the harm that Plaintiffs have suffered.

198.    After sending these videos, Defendants Aspinwall and Mancino switched platforms to Defendant Telegram Messenger Inc.'s Telegram application.

199.    While communicating on Telegram, Defendant Aspinwall requested a photo of the bed featured used in the heinous videos sent over Scruff.

200.    Over Telegram, Defendant Mancino sent a photo of Plaintiff J.R.'s bed and the Defendant Mancino and Defendant Aspinwall discussed their plans to have sex together and with Plaintiff J.R. on the bed.

201.    Their conversation included the following diabolical comments from Defendant Mancino to Defendant Aspinwall:

MANCINO: "He would love your dick…Yea. And he doesn't even wait for me anymore when he gets horny he knows what to do…He comes and starts running my bulge to get me hard then I'll take it out and he likes to stroke it then lick it and sucks it."

202.    This conversation was similar to a despicable conversation the two had over Scruff. That conversation included:

MANCINO: "Yea [then four-year-old Plaintiff J.R.] knows cock…Yea he's getting into sucking and playing with cock. I want him to like cocks…I wanna share him."

203.    Defendant Mancino and Defendant Aspinwall both committed sexual assault, sexual grooming, sexual battery, and various other sexual crimes through Scruff and Telegram.

204. *Only* by and through these internet platforms, did Defendants Aspinwall and Mancino meet and commit the heinous acts which injured Plaintiffs.

205. Defendant Perry Street Partners, through its platform, Scruff, facilitated Defendant Aspinwall's crimes by allowing him, a known sexual predator, to connect with other potential sexual predators on its platform.

206. Defendant Telegram Messenger, Inc., through its platform Telegram, facilitated Defendant Aspinwall's crimes by allowing him, a known sexual predator, to connect with other potential predators on their platform.

207. If Defendant Perry Street Software had been appropriately monitoring and policing its platform Scruff, Defendant Aspinwall, a known sexual predator, would not been able to create an account, or at the very least, would have been monitored to stop him from repeating his dangerous past alleged behavior.

208. If Defendant Telegram Messenger Inc. had been appropriately monitoring and policing its platform Telegram, Defendant Aspinwall, a known sexual predator, would not have been able to create an account, or at the very least, would have been monitored to stop him from repeating his dangerous past alleged behavior.

209. Both Internet Defendants had the capability and capacity to prevent child sex trafficking and exploitation on its platform regarding this specific matter.

210. Without Scruff, Defendants Mancino and Aspinwall would not have met.

211. Had Defendants Aspinwall and Mancino not met, they would not have exchanged photos and videos depicting Plaintiff J.R. being sexually assaulted.

212. Had Defendants Aspinwall and Mancino not met over Scruff, Aspinwall would not have been able to solicit these heinous videos and photos of Plaintiff J.R.

213.    Upon information and belief, Defendant Telegram Messaging, Inc. knew or should have known that child predators were using their platform Telegram regularly.

214.    Telegram is used internationally and media outlets from around the world have reported on the platform being used for the sexual exploitation of minors.[7, 8, 9]

215.    Similarly, Scruff has been used repeatedly for sexual exploitation of minors around the world.[10, 11, 12]

216.    Though both Defendant Perry Street Software and Defendant Telegram Messenger Inc. have attempted[13, 14] to delegate their responsibility to police their platforms in order to protect the public, sexual assault, and misconduct of minors on their platforms has persisted undeterred, as evidenced by Defendant Aspinwall's, a known sexual predator, heinous actions in this case.

217.    Defendants Mancino and Aspinwall *created* the content that harmed Plaintiffs.

218.    Defendants Perry Street Software and Telegram Messenger Inc. *facilitated* the harm suffered by Plaintiffs by negligently failing to monitor and police the platforms and by using defective software.

219.    Upon information and belief, both Defendant Telegram Messenger, Inc. and Defendant Perry Street Software provide in their privacy agreement that they may utilize personal information, including messages between users and sign-up information, to create a safer environment on their platforms.[9, 15]

---

[7] https://mashable.com/article/nudes-revenge-porn-crime-telegram
[8] https://theprint.in/tech/rape-videos-child-porn-terror-telegram-anonymity-is-giving-criminals-a-free-run/307959/
[9] https://edition.cnn.com/2021/01/15/asia/south-korea-telegram-digital-sex-intl-hnk-dst/index.html
[10] https://www.palmbeachpost.com/story/news/crime/2017/08/10/florida-zoo-employee-accused-sex/7299700007/
[11] https://www.dailymail.co.uk/news/article-3955462/Man-19-used-gay-dating-app-Grind-boys-released-prison-told-counselling.html
[12] https://www.artnews.com/art-news/news/efrem-zelony-mindell-pleads-not-guilty-1234654667/
[13] https://web.archive.org/web/20211115225608/https://t.me/s/stopCA
[14] https://www.perrystreet.com/privacy
[15] https://telegram.org/privacy?setln=fa#:~:text=Telegram%20has%20two%20fundamental%20principles,and%20feature%2Drich%20messaging%20service ("5.3. Spam and Abuse: To prevent phishing, spam and other kinds of

220.    Defendants Perry Street Software and Telegram Messenger Inc.'s use of personal information for privacy and security practices should have safeguarded the platform from its use by a known sexual predator, such as Defendant Aspinwall.

221.    It did not and Plaintiffs have suffered harm as a result.

222.    Defendants Perry Street Software and Telegram Messenger Inc. will likely attempt to claim that the content was created by users and therefore they are protected by Section 230 of the Communications Decency Act.

223.    Section 230 only applies when "(1) The defendant is a provider or user of an interactive computer service; (2) the plaintiff's claim holds the defendant responsible as the publisher or speaker of any information; and (3) the relevant information was provided by another information content provider." [16]

224.    Plaintiffs do not allege that Defendants Perry Street Software and Telegram Messenger Inc. were either the "publisher or speaker" of the harmful content, but that their negligence in failing to safeguard their platforms from known sexual predators *facilitated* the harm to the Plaintiffs in this case.

225.    Therefore, Defendants Perry Street Software and Telegram Messenger Inc. cannot hide behind a Section 230 defense.

**<u>FOR A FIRST CAUSE OF ACTION</u>**
**AS TO DEFENDANT MANCINO**
(Assault and Battery)

226.    Plaintiffs reincorporate and reallege the above paragraphs herein verbatim.

---

abuse and violations of Telegram's Terms of Service, our moderators may check messages that were reported to them by their recipients…We may also use automated algorithms to analyze messages in cloud chats to stop spam and phishing.")
[16] *Henderson v. Source for Public Data, L.P.*, 53 F.4th. 110, 119 (4th Cir. 2022) (Richardson, J.) (internal citations omitted).

227.    Videos confiscated from Scruff and Telegram by the federal authorities depict Defendant Mancino, at Defendant Aspinwall's request, repeatedly sexually molesting Plaintiff J.R.

228.    Upon information and belief, Defendant Mancino often sexually assaulted and battered Plaintiff J.R., as he proudly makes clear in his messages over Scruff and Telegram to Defendant Aspinwall.

229.    As a direct and proximate result of Defendant Mancino's actions outlined above, Plaintiff J.R. has suffered severe damages. Plaintiff J.R. will likely have to undergo medical treatment, including intense psychiatric therapy, for the remainder of his life.

230.    Plaintiff J.R. and Plaintiff Jane Roe are entitled to actual and punitive damages against Defendant Mancino.

## FOR A SECOND CAUSE OF ACTION
(Negligence/Recklessness/Willful and Wanton Conduct)

231.    Plaintiffs reincorporate and reallege the above paragraphs herein verbatim.

### AS TO DEFENDANT MANCINO

232.    As alleged above, Plaintiff J.R. was sexually groomed and abused by his father, Defendant Mancino.

233.    Every person owes a duty to all other persons to use reasonable care to avoid causing injury to them or their property.

234.    Defendant Mancino had a duty of reasonable care towards Plaintiff J.R. in addition to a heightened duty of care as Plaintiff J.R.'s parent and caregiver.

235.    Defendant Mancino unquestionably breached these duties by sexually molesting, grooming, and soliciting depictions of same to other sexual predators.

## AS TO DEFENDANT ASPINWALL

236.    As alleged above, Plaintiff J.R. was sexually groomed, molested, and abused by Defendant Mancino at the request of Defendant Aspinwall.

237.    Every person owes a duty to all other persons to use reasonable care to avoid causing injury to them or their property.

238.    Defendant Aspinwall had a duty of reasonable care towards Plaintiff J.R.

239.    Defendant Aspinwall's requesting of photos and videos of sexual molestation and constant unequivocal encouragement of sexual grooming foreseeably led to continued sexual exploitation of Plaintiff J.R.

240.    Defendant Aspinwall breached any duty to Plaintiff J.R.

## AS TO DEFENDANTS PERRY STREET SOFTWARE AND TELEGRAM MESSENGER, INC.

241.    As alleged above, Defendants Mancino and Aspinwall harmed Plaintiff J.R.

242.    As alleged above, Defendants Mancino and Aspinwall met on Defendant Perry Street Software's application, Scruff.

243.    As alleged above, Defendant Mancino and Aspinwall utilized Defendant Perry Street Software's application, Scruff, to sexually groom and molest Plaintiff J.R.

244.    As alleged above, Defendants Mancino and Aspinwall utilized Defendant Telegram Messenger, Inc.'s application, Telegram, to sexually groom and molest Plaintiff J.R.

245.    As alleged above, Defendant Aspinwall was indicted in 2015 for using an internet platform to sexually assault a minor boy.

246.    At all relevant times, Defendants Perry Street Software and Telegram Messenger, Inc. created a foreseeable zone of risk by creating, fostering, and maintaining an environment

where human traffickers, including Plaintiff's trafficker, could evade legal detection while coercing human trafficking victims, including Plaintiff, to engage in illegal sex acts.

247. Every person owes a duty to all other persons to use reasonable care to avoid causing injury to them or their property.

248. Defendants Perry Street Software and Telegram Messenger, Inc. owed a duty of reasonable care to Plaintiff J.R.

249. Plaintiff J.R. fell within the above-mentioned zone of risk created by Defendants Perry Street Software and Telegram Messenger, Inc.

250. Defendants Perry Street Software and Telegram Messenger, Inc. breached their duty to Plaintiff J.R. by allowing a known sexual predator, Defendant Aspinwall, to use their platform to solicit depictions of sexual molestation.

251. Defendants Perry Street Software and Telegram Messenger, Inc.'s failure to keep known sexual predators off their social messaging platforms foreseeably led to Plaintiff J.R. being continually sexually abused and molested for the sexual gratification of its users.

252. Defendants Perry Street Software and Telegram Messenger, Inc.'s failure to properly monitor and police their applications  foreseeably led to Plaintiff J.R. being continually sexually abused and molested for the sexual gratification of its users.

253. Defendants Perry Street Software and Telegram Messenger, Inc.'s failure to use up to date software and application to prevent the use of its sites for child sex trafficking and exploitation foreseeably led to Plaintiff J.R. being continually sexually abused and molested for the sexual gratification of its users.

254. As a direct and proximate result of the negligent, grossly negligent, reckless, willful, and wanton behavior of Defendants, Plaintiff J.R. and Plaintiff Jane Roe suffered damages.

Plaintiffs are entitled to judgement against Defendants for actual damages and punitive damages, all to be determined by a jury at the trial of this action.

**FOR A THIRD CAUSE OF ACTIONS**
**AS TO ALL DEFENDANTS**
(Negligence *per se*)

255.    Plaintiffs reincorporate and reallege the above paragraphs herein verbatim.

256.    South Carolina Code section 16-15-405(b) penalizes any individual or corporation who: distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity or appearing in a state of sexually explicit nudity when a reasonable person would infer the purpose is sexual stimulation."

257.    Plaintiffs may bring a negligence action against those who violate a statute if (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that he is a member of the class of persons the statute is intended to protect.[17]

258.    Plaintiff J.R., as a minor at risk of sexual exploitation over the internet, is clearly the intended beneficiary of S.C. Code Ann. § 16-15-405(b).

259.    As alleged above, Plaintiff J.R. has suffered the harm that Section 16-15-405(b) was designed to protect.

260.    Accordingly, Section 16-15-405(b) may be used to establish a specific duty owed to Plaintiff J.R.

261.    All of the Defendants breached Section 16-15-405(b).

262.    Defendants Mancino and Aspinwall "distribute[d], transport[ed], exhibit[ed], receive[d]… exchang[ed], [*and*] solicit[ed] material that contains a visual representation of a minor

---

[17] *Rayfield v. S.C. Department of Corrections*, 297 S.C. 96, 374 S.E.2d 910 (Ct. App. 1995); Whitlaw *v. Kroger Co.*, 306 S.C. 51, 410 S.E.2d 251 (1991); and *Norton v. Opening Break of Aiken*, 313 S.C. 508, 512, 443 S.E.2d 406, 408 (Ct.App. 1994)

engaged in sexual activity or appearing in a state of sexually explicit nudity when a reasonable person would infer the purpose is sexual stimulation." (emphasis added).

263.    Doing any one of these acts would have constituted a breach of Section 16-15-405(b). Accordingly, Defendants Aspinwall and Mancino repeatedly breached the statute that was designed to protect Plaintiff J.R.

264.    Defendants Perry Street Software and Telegram Messenger, Inc., via their internet platforms, "transport[ed]… material that contains a visual representation of a minor engaged in sexual activity or appearing in a state of sexually explicit nudity when a reasonable person would infer the purpose is sexual stimulation."

265.    Accordingly, Defendants violated Section 15-16-450(b), a statute designed to protect Plaintiff J.R. against the kind of harm he suffered, and both are liable for the harm caused as a result of their conduct.

266.    As a direct and proximate result of the negligence per se by Defendants, Plaintiff J.R. and Plaintiff Jane Roe suffered damages. Plaintiffs are entitled to judgement against Defendants for actual damages and punitive damages, all to be determined by a jury at the trial of this action.

**FOR A FOURTH CAUSE OF ACTION**
**AS TO ALL DEFENDANTS**
(Civil Conspiracy)

267.    Plaintiffs reallege and reincorporate the above paragraphs herein verbatim.

268.    Prior to the grooming, exploitation, and abuse of Plaintiff J.R., upon information and belief, Defendants Perry Street Software and Telegram Messenger, Inc. knew or should have known about Defendant Aspinwall's history of using internet platforms to sexually abuse minors.

269.    Further, under the privacy terms promulgated by both Defendant Perry Street Partners and Defendant Telegram Messenger, Inc., both Scruff and Telegram had access to the messages exchanged between Defendants Mancino and Aspinwall.

270.    Defendant Telegram Messenger, Inc. utilized "automated algorithms" to survey messages exchanged between users.

271.    These algorithms either (1) did not alert Telegram to Defendants Aspinwall and Mancino's conversation about molesting a four-year-old or (2) did and was ignored.

272.    In either situation, Defendants Perry Street Software and Telegram Messenger, Inc. knew or reasonably should have known that allowing a known sexual predator onto their platform would lead to solicitation of sexually explicit and exploitative content on their platforms.

273.    Despite this prior knowledge of Defendant Aspinwall's sexual proclivities with minors, Defendants Perry Street Software and Telegram Messenger, Inc. gave him unfettered access to their platforms.

274.    This access constitutes conspiring with Defendants Aspinwall and Mancino in the sexual exploitation of Plaintiff J.R.

275.    The predicate acts of all Defendants necessary to constitute a conspiracy includes failure to prohibit Aspinwall's use of Scruff or Telegram; failing to report Defendants Aspinwall and Mancino to the appropriate criminal authorities as other social media companies had[18]; failure to work together to impose a policy that protects users and third parties alike; and other acts or omissions that may be discovered through the discovery process of this action.

---

[18] https://www.postandcourier.com/news/snapchat-tip-leads-police-to-charge-charleston-man-with-child-sex-crimes/article_80e9d2ea-5ebc-11ed-957d-e3b963eb10aa.html

276.    As a direct and proximate result of the conspiracy by Defendants, Plaintiff J.R. and Plaintiff Jane Roe suffered damages. Plaintiffs are entitled to judgement against Defendants for actual damages and punitive damages, all to be determined by a jury at the trial of this action.

**FOR A FIFTH CAUSE OF ACTION**
**AS TO ALL DEFENDANTS**
(Outrage/Intentional or Reckless Infliction of Emotional Distress)

277.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

278.    Defendants recklessly inflicted severe emotional distress on Plaintiff J.R. and Plaintiff Jane Roe by virtue of their actions and it was certain or substantially certain that such distress could result from Defendants' conduct.

279.    Defendants' conduct was extreme and outrageous as to exceed all possible bounds of decency and is intolerable in a civilized community.

280.    Defendants' actions cause Plaintiff emotional distress.

281.    The emotional distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it and the distress it caused, includes, but it is not limited to, medical problems, emotional issues, mental anguish, and behaviors that are capable or objective diagnosis.

282.    As a direct and proximate result of the intentional and/or reckless infliction of emotional distress on Plaintiff J.R. and Plaintiff Jane Roe, both have suffered damages. Plaintiffs are entitled to judgement against Defendants for actual damages and punitive damages, all to be determined by a jury at the trial of this action.

**FOR A SIXTH CAUSE OF ACTION**
**AS TO DEFENDANTS MANCINO AND ASPINWALL**
(Invasion of Privacy)

283.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

284.    By sending photos and videos of a minor to others for the purpose of sexual gratification, Defendant Mancino committed the tort of invasion of privacy against Plaintiff J.R.

285.    By soliciting photos and videos of a minor from other for the purposes of sexual gratification, Defendant Aspinwall committed the tort of invasion of privacy against Plaintiff J.R.

286.    Plaintiff J.R. was harmed by this invasion of privacy and suffered damages.

287.    As a direct and proximate result of the invasion of privacy of Plaintiff J.R. and Plaintiff Jane Roe, both have suffered damages. Plaintiffs are entitled to judgement against Defendants for actual damages and punitive damages, all to be determined by a jury at the trial of this action.

## FOR A SEVENTH CAUSE OF ACTION
## AS TO DEFENDANT PERRY STREET SOFTWARE
### (Products Liability – Design Defect)

288.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

289.    Under Restatement (Second) of Torts § 402(a), South Carolina and New York law, one who sells any product in a defective condition unreasonably dangerous is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the plaintiff without substantial change in the condition which it was sold.

290.    Upon information and belief, Defendant Perry Street Software designed, manufactured, marketed, and sold its product, "Scruff," in a condition that was unreasonably dangerous because it failed to restrict access to known sexual predators.

291.    Defendant Perry Street Software is liable either strictly or negligently in creating a product, Scruff, with such defects.

292.    Plaintiffs were foreseeably harmed by this product defect when a known sexual predator, Defendant Aspinwall, was given unfettered access to "Scruff" and used it as a platform to solicit sexually exploitative photos and videos of Plaintiff J.R.

293.    Upon information and belief, Defendant Aspinwall was given this unfettered access to Scruff without any verification of his background, any questioning of his prior use of like platforms for the solicitation of criminal behavior, or attestation from him that his prior use was permissible. He merely clicked through a few screens to create an account.

294.    Defendant Perry Street Software could have utilized cost-effective, reasonably feasible alternative designs including, but not limited to:

a.  Identity verification;

b.  Background check;

c.  Freely working with local law enforcement to identify previous abusers of these platforms and banning such individuals from future use;

d.  Mandatory attestation of no previous criminal use of like platforms;

e.  Instructions on using the platform safely;

f.  Implementing freely available industry-proven child protection API tools such as Project Arachnid Shield to help limit and prevent child sexual exploitation, sextortion, and distribution of known child sexual media through their products;

g.  Removing barriers to the deactivation and deletion of accounts;

h.  Implementing reporting protocols to allow users or visitors of Defendant Perry Street Software's products to report child sexual media and adult predator accounts specifically without the need to create or log in to the products prior to reporting;

295.    Defendant Perry Street Software did not employ any of these methods and instead only required that the user click through a few screens.

296.    As a result of this dangerous and defective design attribute in "Scruff," Plaintiffs have suffered and continue to suffer damages in the form of emotional distress, negative mental health conditions, pain and suffering, and unforetold reputational harm.

297.    Defendant Perry Street Software is liable to Plaintiffs for actual and punitive damages based upon the negligent, grossly negligent, reckless, willful, and wanton design of their product, which was knowingly hosting sexual predators and yet did nothing to protect innocent third parties from the foreseeable harms such conduct could cause and has caused to Plaintiffs.

### FOR AN EIGHT CAUSE OF ACTION
### AS TO DEFENDANTS PERRY STREET AND TELEGRAM
(Violations of 18 U.S.C. §§ 1595 and 1591)

298.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

299.    Plaintiff J.R. is a survivor of sex trafficking within the meaning of 18 U.S.C. §1591 and is entitled to bring a civil action under 18 U.S.C. §1595 against any individual or entity whose violations of the TVPRA proximately caused the Plaintiff J.R. to sustain physical and psychological injuries.

300.    The Internet Defendants knowingly benefitted from participating in a venture which they knew or should have known was engaged in illegal sex trafficking in violation of the TVPRA, 18 U.S.C §159l(a)(2), by inter alia, engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's victimization of the Plaintiff J.R. for commercial sexual exploitation.

301.    The Internet Defendants knew that their repeated failures to address known risks of human trafficking on their internet applications would increase the overall volume of illegal commercial sexual exploitation and victimization on their applications.

302.    Defendants knowingly benefitted from facilitating the trafficking of persons on the internet applications.

303.    The Internet Defendants knowingly benefitted financially from the presence of the traffickers on their internet applications by their use of the application for which the internet defendants derived financial benefit.

304.    Plaintiffs bring claims under 18 U.S.C. § 1595 based on each of the Defendants' financial benefit garnered from knowingly assisting, supporting, and facilitation the sexual solicitation and exploitation of Plaintiff J.R. for sex acts.

305.    Defendants knowingly received value for its ongoing business practices that allow Scruff to become a means of online child exploitation despite the risk to children like Plaintiff J.R.

306.    Each of the Defendants knowingly participates in a sex trafficking venture and receive value in the form of more users and more advertising revenue and are fully aware of the ongoing sexual abuse of children through the use of their social media products. Despite this knowledge, each of the Defendants fails and refuses to comply with the requirements of COPPA at 15 U.S.C. §§ 6501-6505.

307.    Each of the Defendants fails and refuses to implement safeguards within its respective products that would otherwise prevent the sexual abuse and exploitation of unsuspecting children.

308.    Each of the Defendants knew or should have known that it received value for its respective ongoing business practices that allow its social media products to become a means of online child sexual exploitation despite the risk to children.

309.    The conduct of each of the Defendants knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and/or 1595(a).

310.    Each Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew that third parties, like Plaintiff J.R., would be forced to engage in sexual acts while under the age of 18 years old.

311.    In an interstate and international commercial effort, each of the Defendants knowingly permitted known sexual predators, like Defendant Aspinwall, to use their platforms.

312.    The conduct of each Defendant caused serious harm to Plaintiffs including, without limitation, physical, psychological, financial, and reputational.

313.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious indifference to the consequences of its conduct, including to the health, safety, and welfare of children.

314.    Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**FOR A NINTH CAUSE OF ACTION**
**AS TO ALL DEFENDANTS**
(Violation of 18 U.S.C. § 2255)

315.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

316.    18 U.S.C. § 2255 permits minor victims of forced labor, sex trafficking, forced sex, aggravated sexual abuse, sexual abuse, sexual abuse of a minor or child, sexual exploitation, selling or buying, production of exploitative content, and other sexual acts, to bring a civil suit for damages against those at fault.

317.    All the Defendants, as outlined above, are at fault for the harm caused to Plaintiffs.

318.    Plaintiff J.R. is a minor, who, as alleged above, was a victim of sexual assault, sexual exploitation, sexual abuse, and other heinous and predatory behaviors at the hands of the Individual Defendants.

319.    As alleged above, this conduct would not have been possible without the Internet Defendant's negligence in policing their platforms.

320.    Plaintiffs have suffered voluminous damages as a result of the conduct alleged of all these Defendants.

321.    Plaintiffs are entitled to bring suit under 18 U.S.C. section 2255 for all allowable damages pursuant to this statute.

### FOR A TENTH CAUSE OF ACTION
### AS TO DEFENDANTS PERRY STREET AND TELEGRAM
(Violation of Trafficking Against Persons - S.C. Code Ann. § 16-3-2010 et al.)

322.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

323.    Plaintiff J.R. is a survivor of trafficking against person within the meaning of S.C. Code Ann 16-3-2010 and 2020 and is entitled to bring a civil action under S.C. Code Ann. §16-3-2060 ("TAP")  against any individual or entity whose violations of TAP proximately caused the Plaintiff to sustain physical and psychological injuries.

324.    The Internet Defendants knowingly benefitted from participating in a venture which they knew was engaged in Trafficking of Persons in violation of S.C. Code Ann. § 16-3-2010 et. al. by inter alia, engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's victimization of the Plaintiff for commercial sexual services and exploitation.

325.    The Internet Defendants knew that their repeated failures to address known risks of human trafficking on their internet properties would increase the overall volume of illegal commercial sexual exploitation and victimization at their internet properties.

326.    Defendants knowingly benefitted from facilitating the trafficking of persons on the internet properties.

327.    As a result of the Internet Defendants violations of the TAP, Plaintiff has suffered substantial physical and psychological injuries, as well as other damages.

328.    Plaintiff is entitled to an award of costs, attorneys fees and triple damages for all actual and consequential damages caused by the Internet Defendant willful and malicious acts in facilitating the Human Trafficking of the Plaintiff.

## FOR AN ELEVENTH CAUSE OF ACTION
### AS TO ALL DEFENDANTS
(Necessaries Claim)

329.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim

330.    Jane Roe is responsible for Minor Child's medical bills, medical care, and overall care until he turns eighteen (18).

331.    Since Minor Child is under a disability, the Plaintiff will be required to provide this care for an undetermined length of time after Minor Child reaches the age of eighteen (18).

332.     Jane Roe will suffer economic damages, including but not limited to, the provision of medical care, life care expense, psychiatric expenses, lost wages, counseling services, and special programs for abused children due to the actions and/or inactions of Defendants as delineated in all paragraphs above.

333.     As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, the Minor Child has suffered the following damages, including, but not limited to:

a)     Substantial medical expenses that are reasonably certain to occur for the remainder of his life;

b)     Substantial life care expenses that are reasonably certain to occur for the remainder of his life;

c)     Substantial loss of earnings and impairment of earning capacity that are reasonably certain to occur for the remainder of his life;

d)     Disability that is likely to occur for the remainder of his life, including the necessity of psychiatric care;

e)     Substantial injury to his psyche and emotional state; and,

f)     Substantial loss of enjoyment of life.

330.     As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, Jane Roe suffered the following damages, including, but not limited to:

a)     Substantial medical expenses for the minor child that are reasonably certain to occur before he reaches the age of 18;

b)     Substantial life care expenses for the minor child that are reasonably certain to occur before the age of 18;

c)     Care related to minor child's disability that is likely to occur before the age of 18, including the necessity of psychiatric care;

d)   Provision of extraordinary medical care for the minor child;

e)   Expenditure of economic resources to provide for the minor child before the age of 18, including, but not limited to, special education, assistance, or appropriate therapies such as art therapy, equine therapy, or any other type of treatment which may alleviate some of the Minor Child's suffering due to Defendants' actions and/or inactions;

f)   Substantial injury to their psyche and emotional state;

g)   Loss of society, companionship, and consortium with minor child; and,

h)   Lost wages from having to take time off to manage minor child, the investigation, and doctors' visits, among other things.

331.   Jane Roe should be awarded any and all damages flowing from any necessaries claim or any other damages that she may suffer because of Defendants' (and their employees') multiple actions and/or inactions.

### FOR A TWELTH CAUSE OF ACTION
### AS TO DEFENDANTS PERRY STREET AND TELEGRAM
(Unfair trade practices – violation of S.C. Code Ann. § 39-5-10 *et seq.*)

332.   The South Carolina Unfair Trade Practices Act ("SCUTPA") declares unlawful "[a]ny unfair methods of competition and unfair or deceptive acts or practices within the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).

333.   "Trade and commerce" are defined by the statute as "sale or distribution of any services." S.C. Code Ann. § 39-5-10(b).

334.   Both Internet Defendants are engaged in trade and/or commerce in South Carolina and thus subject to the SCUTPA.

335.   Upon information and belief, both Internet Defendants hold their platforms out as safe for public use.

336.   Specifically advertising their product to consumers in this way and putting in place public protocols for safety that are not followed is a violation of SCUPTA.

337.    As alleged above, because of safety defects in both Defendant Perry Street Software's "Scruff" and Defendant Telegram Messenger, Inc.'s "Telegram," Plaintiffs were harmed.

338.    The harm suffered by Plaintiffs in this case is capable of repetition and therefore a matter of public interest. *See Daisy Outdoor Advertising v. Abbott*, 317 S.C. 14, 451 S.E.2d 394 (1996).

339.    The actual, dangerous, nature of the Internet Defendants' respective products directly contradicted the message held out to consumers of a safe environment.

340.    Plaintiffs are entitled to damages as a result of Internet Defendants' false and deceptive trade practices.

WHEREFORE, Plaintiffs respectfully pray for judgement against Defendants for all actual and punitive damages alleged herein, for the costs, attorney's fees (where allowable), treble damages (where allowable)  and for such other and further relief as this Honorable Court deems proper and just.

Respectfully submitted,

s/S. Randall Hood
S. Randall Hood
Fed. Bar No.: 6103
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Dr.
Rock Hill, SC 29732
803.327.7800
rhood@mcgowanhood.com

James H. Leffew, IV
Fed. Bar No.: 13669
125 Wappo Creek Dr., Bldg. G, Suite 102
Charleston, SC 29412
843.788.9332
james@leffewlegal.com

M. Nolan Webb
Fed. Bar No.: 13948
McGowan, Hood, Felder, & Phillips, LLC
10 Shem Drive, Suite 300
Mount Pleasant, SC 29464
843.268.4639
nwebb@mcgowanhood.com

*Attorneys for Plaintiffs*

Mount Pleasant, South Carolina
June 7, 2023